LOBSTERS, INC., et al., Plaintiffs,

v.

Donald EVANS, Secretary
of Commerce, et al.,
Defendants.

No. CIV.A.03–11434–NMG.

United States District Court,
D. Massachusetts.

Nov. 29, 2004.

Jeffrey T. Angley, Phillips & Angley, Boston, MA, for Lobsters, Inc., Lawrence M. Yacubian, Plaintiffs.

Anton P. Giedt, United States Attorney's Office, Boston, MA, for United States of America, Charles Juliand, Donald Evans, Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

This case arises from an administrative decision rendered by the National Marine Fishery Service ("NMFS"), a division of the National Oceanic and Atmospheric Administration ("NOAA" or "the Agency") of the Department of Commerce, which assessed penalties against plaintiffs for fishing in a closed area and making a false statement to a United States Coast Guard ("USCG") officer. Plaintiffs claim that the $250,000 fine and revocation of their fishing permits was arbitrary, capricious, unsupported by substantial evidence and contrary to law. This Court has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 ("APA").

## I. *Background*

Plaintiff Lobsters, Inc. is the owner of the F/V Independence, a 95–foot eastern rig scalloper. Plaintiff Yacubian is the President and sole stockholder of Lobsters, Inc. and Captain of the F/V Independence. The Independence held a full-time, limited access Atlantic sea scallop permit until the permit sanction assessed in the administrative action preceding this case became effective.

In 1998, NOAA implemented a Northeast Vessel Monitoring System ("VMS") to track and transmit vessel positions. NOAA approved Boatracs, Inc. ("Boatracs") as the sole VMS vendor. Effective May 15, 1998, all limited access Atlantic sea scallop permit holders were required to install a Boatracs unit aboard their vessels so as to allow NOAA to monitor the location of the vessels. Boatracs does not develop or maintain a tracking system but is the exclusive domestic distributor for marine applications of OmniTracs, a satellite-based communications and tracking system manufactured by Qualcomm. Qualcomm calculates vessel positions and sends the information to Boatracs. Thus, all vessel position data transmitted from Boatracs to NMFS comes from Qualcomm. Boatracs claims that its system is accurate to within 300 meters 95% of the time.

On December 4, 1998, the Independence, Yacubian and five crew members began a

fishing trip. The vessel was equipped with a Boatracs Mobile Communications Terminal. From December 6 to December 11, 1998, NMFS observed, through Boatracs, that the Independence had entered Closed Area II more than 44 times. Closed Area II is an area in the Gulf of Maine which has been designated as a closed area, for the purpose of preventing the collapse of the principal groundfish stocks of cod, haddock and yellowtail flounder, by a Fishery Management Plan prepared by a fishery management council established under the Magnuson–Stevens Act, 16 U.S.C. § 1811, and approved by NMFS.

Over a four-hour period from December 10 to December 11, 1998, the USCG Cutter Wrangell ("Wrangell"), using its Digital Global Positioning System ("GPS"), radar and gyrocompass, observed that the Independence moved in and out of Closed Area II several times. USCG officers noted that the Independence had moved inside Closed Area II at courses and speeds consistent with what they believed to be a vessel in the act of fishing. On December 11, at 0051 hours local time, from about 10.7 nautical miles away, Wrangell personnel fixed the position of the Independence at approximately 0.95 nautical miles inside the boundary of Closed Area II.

At approximately 0207 hours on December 11, 1998, a boarding party from Wrangell led by LTJG Timothy Brown ("Brown") boarded the Independence. Brown told Yacubian that it was a routine boarding and asked Yacubian how many scallops were on the deck. Yacubian responded that he thought he had 4 to 5 bushels per side. Brown also asked how many pounds of scallops were in the vessel's hold. Yacubian replied that there were approximately 2,500 pounds, although there was no scale on board. The USCG boarding party subsequently estimated that there were at least 17 bushels of scallops per side on deck and approximately 4,300 pounds of scallops in the hold. Brown inquired as to the Independence being in Closed Area II and Yacubian denied that the vessel had entered the area, advising him to check with Boatracs to get information regarding where the vessel had been. The USCG then escorted the Independence to New Bedford, Massachusetts, and seized her catch.

On June 14, 2000, Charles R. Juliand, NOAA's general counsel, issued a Notice of Violation and Assessment ("NOVA") to plaintiffs, charging them with violating the Magnuson–Stevens Act, 16 U.S.C. § 1857(1)(A) and regulations promulgated thereunder, 50 C.F.R. 648.14(a)(39) (prohibiting entering Closed Area II), 648.81(b)(1) (defining Closed Area II) and 600.725(i) (prohibiting the making of false statements). The NOVA contained three counts, alleging that: 1) plaintiffs entered approximately 1.36 nautical miles into Closed Area II at 2321 hours local time on December 8, 1998, 2) plaintiffs entered, by approximately 0.65 nautical miles, within Closed Area II at 0051 hours local time on December 11, 1998, and 3) Yacubian made false statements to Brown on December 11, 1998. In the NOVA, NOAA assessed against plaintiffs a $250,000 civil monetary penalty, $110,000 for each Closed Area II violation and $30,000 for the false statement. NOAA further issued a Notice of Permit Sanction ("NOPS"), permanently revoking the federal fishing vessel permit of the F/V Independence and the federal vessel operator permit of Yacubian.

Plaintiffs requested a hearing on the matter before an Administrative Law Judge ("ALJ"). The hearing was held from June 19 through June 22, 2001, before Coast Guard ALJ Edwin Bladen ("the Hearing"). In his December 5, 2001 Initial Decision and corresponding order, ALJ Bladen sustained the NOVA and, al-

though considering sanctions *de novo* by consent of the parties, assessed the same total monetary and permit sanctions as had the NOAA. Plaintiffs sought discretionary review pursuant to 15 C.F.R. § 904.273 and on July 2, 2003, the discretionary appeal was denied, thereby rendering the Initial Decision a final agency action.

On August 1, 2003, Plaintiffs commenced this action. They allege that the Agency's decision was arbitrary, capricious, an abuse of discretion and not supported by substantial evidence, all in violation of the APA. Pending before the Court is plaintiffs' summary judgment motion which asks the Court to vacate the Agency's findings of liability and assessment of civil penalties and permit sanctions and to remand the matter to the Agency for a *de novo* assessment of civil penalties. Defendants have filed a cross-motion for summary judgment which is also before the Court.

## II.  *Analysis*

### A.  Standard of Review of Administrative Proceedings

The scope of this Court's review of the evidence is limited to the administrative record that was before the agency at the time the decisions were made. 5 U.S.C. § 706; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Under the APA, courts reviewing final agency action must hold unlawful and set aside agency action and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

The Agency's findings of fact underlying the civil penalty imposed will be set aside if not supported by substantial evidence in the record. 16 U.S.C. § 1858(b); 5 U.S.C. 706(2). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. NLRB,* 305 U.S. 197, 217, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It is "more than a mere scintilla." *Id.* Further, the substantiality of the evidence must take into account the "record in its entirety," including "whatever in the record fairly detracts from its weight." *Universal Camera v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The substantial evidence standard, however, "certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. United States Dep't of Labor,* 336 F.3d 51 (1st Cir.2003). It is, after all, the prerogative of the ALJ to

> draw inferences and make credibility assessments, and [courts] may not disturb his judgment and the [agency's] endorsement of it so long as the findings are adequately anchored in the record.

*Id.*

With respect to questions of law other than an agency's interpretation of a statute it administers, courts review the determination of the agency *de novo. Id.* at 55; 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law"). However, courts owe "substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

### B.  Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st

Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

## C. Incursions into Closed Area II

### 1. *Applicability and Application of Daubert Considerations*

■ The ALJ found, based largely on evidence provided by the Boatracs system, that the Independence had entered Closed Area II. Plaintiffs argue that such evidence should not have been admitted at the Hearing because the Agency had not demonstrated that the evidence met the *Daubert* standard for reliability.

In *Daubert*, the Supreme Court held that Rule 702 of the Federal Rules of Evidence imposes upon the trial court a gatekeeper obligation in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The judge's gatekeeping function was later extended to apply to all expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Daubert* and its progeny interpret the Federal Rules of Evidence, however, and the federal rules of evidence do not apply to NOAA hearings. 15 C.F.R. § 904.251(b). Therefore, strictly speaking, the rule of Daubert does not apply to proceedings before NOAA. Nonetheless, "the spirit of *Daubert*" does apply to administrative proceedings because "'[j]unk science' has no more place in administrative proceedings than in judicial ones." *Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir.2004).

The rules governing evidence at NOAA hearings provide that

> All evidence that is relevant, material, reliable, and probative, and not unduly repetitious or cumulative, is admissible at the hearing. Formal rules of evidence do not necessarily apply to the proceedings, and hearsay evidence is not inadmissible as such.

15 C.F.R. § 904.251(b). The reliability requirement of this Regulation, therefore, adopts the "spirit of *Daubert*" as the standard to be used in connection with administrative hearings.

On June 19 and 20, 2001, ALJ Bladen held a *Daubert* hearing to determine the reliability and relevance of the expert tes-

timony regarding Boatracs and to rule on its admissibility at trial. Before that hearing he stated that the "relevant issue is whether the Boatracs vessel tracking system is reliable technology which can accurately determine a vessel's geographic location." At the *Daubert* hearing, he heard from two qualified witnesses for the Agency and one qualified witness for plaintiffs and ruled that he was persuaded that Boatracs was reliable for reporting position data accurately 95% of the time within 300 meters of the actual position. He therefore allowed Boatracs evidence to be introduced at the Hearing.

Although plaintiffs introduced testimony at the *Daubert* hearing tending to show the unreliability of Boatracs, the record clearly demonstrates that the ALJ's conclusion that Boatracs was reliable was supported by substantial evidence. Thus, it was proper to admit Boatracs evidence at the Hearing.

The Initial Decision stated that "the *Daubert* factors may be used, not to exclude evidence, but to determine the reliability of expert testimony." This Court disagrees with that formulation of the applicabilty of the principles of *Daubert* to administrative hearings. The *Daubert* factors can, in fact, be used to exclude evidence from an administrative hearing if the ALJ finds the evidence to be unreliable; their function is not limited, as the ALJ in his Initial Decision suggested, to bearing upon the weight afforded to the evidence once admitted. Nonetheless, such an error was harmless because there was substantial evidence on which the ALJ could have based his statement in the record that he found Boatracs to be reliable and thus evidence based on Boatracs was properly admitted at the Hearing.

### 2. *Substantial Evidence of Incursions*

The record as a whole, including the Boatracs evidence, which was properly ad-

mitted, contains substantial evidence from which the ALJ and the Agency could have determined, by a preponderance of the evidence, that the Independence did enter Closed Area II on December 8 and 11, 1998. Although the Court notes plaintiffs' arguments which attempt to discredit the evidence relied upon by the ALJ, plaintiffs have not convinced this Court that the record is bereft of substantial evidence of the violations. This Court, therefore, declines to overturn the Agency's finding that plaintiffs entered Closed Area II and thereby violated the Magnuson–Stevens Act as alleged in Counts I and II of the NOVA.

### D. False Statements

■ Plaintiffs allege that there was insufficient evidence from which the ALJ could conclude that Yacubian made a false statement to Brown on December 11, 1998. The regulations promulgated pursuant to the Magnuson–Stevens Act provide that it is unlawful to

> [m]ake any false statement...to an authorized officer concerning the taking, catching, harvesting, landing, purchase, sale, offer of sale, possession, transport, import, export, or transfer of any fish, or attempts to do any of the above.

50 C.F.R. § 600.725(i).

According to the USCG Offense Investigation Report prepared by Brown, after Brown boarded the fishing vessel, he asked Yacubian how many scallops he had on deck. Yacubian "stated that he thought he had four or five bushels per side." Brown then asked how many scallops Yacubian were in the hold and "he stated approximately 2500 lbs." The Agency reported that there were, in fact, approximately 17 bushels of scallops per side and more than 4,300 pounds of scallops in the hold and argued that, therefore, Yabubi-

an's statements to Brown were false. Plaintiffs argue that Yacubian's answers were only estimates, as evidenced by his use of the words "thought" and "approximately" and because there was no scale on board, and that they were not, therefore, false statements. Plaintiffs further argue that Yacubian had no intent to deceive Brown and that violation of 50 C.F.R. § 600.725(i) requires an intent to deceive.

The ALJ viewed plaintiffs' arguments as posing two questions: "First, can an estimate be a false statement? Second, does 50 C.F.R. § 600.725(i) require proof of intent to deceive?" He answered the former question in the affirmative, using a two-part analysis. The ALJ noted that the dictionary definition of "estimate" is "the expression of an opinion of value" and that an expression is obviously a "statement." He then noted that the dictionary definition of "false" is "not genuine or true" and stated:

> Here, the estimates were not objectively true. They weren't even close. In truth, the number of bushels of scallops on deck per side was 17. The hold held, in truth, 4300 pounds of scallops.

The ALJ then held that the regulation does not require proof of intent to deceive and concluded that Brown had, therefore, made a false statement in violation of 50 C.F.R. § 600.725(i).

The ALJ's logic would suffice if Yacubian had said "there are four or five bushels" but does not if the statement was "I think there are four or five bushels." When considering the falsity of a statement of opinion, the party alleging falsity need not prove that the fact underlying the opinion is untrue but rather that the statement of opinion is untrue. Thus, the plain language of the regulation requires that the prosecuting Agency prove that Yacubian did not subjectively believe that the estimates he gave were accurate. The Agen-

cy did not allege that Yacubian did not believe his estimates to be true and the record does not contain substantial evidence suggesting that Yabubian intentionally understated the quantity of scallops on deck. The ALJ's determination that Yacubian made a false statement regarding the quantity of scallops on deck, therefore, cannot stand. See Rodowicz v. Massachusetts Mutual Life Ins. Co., 192 F.3d 162, 175 (1st Cir.1999) (holding that it is too much of "a stretch" to treat statements of expectation, estimate, opinion or judgment as statements of fact and that such statements are not actionable as misrepresentations).

■ Yacubian's allegedly false statement that there were "approximately 2500 lbs." of scallops in the hold is a closer case because it was not expressly couched as an opinion with the prefatory words "I think." However, it would be arbitrary for the distinction between false statements and non-actionable statements of opinion to rest on such minutiae of diction when the underlying message conveyed is clear. The Independence did not have a scale on board. Yacubian testified that he ordinarily measured the quantity of scallops by bag, not by weight, so he was not used to estimating quantity in terms of weight, and Brown testified at the Hearing that he understood Yacubian's statement to be an approximation. "A representation is one of opinion if it expresses only...the belief of the maker, without certainty, as to the existence of the fact." Id., quoting Restatement (Second) of Torts § 538A (1977) (omission in original). As with the other allegedly false statement, the Agency did not allege, and the record does not contain substantial information to support a charge, that Yacubian intentionally underestimated the quantity of scallops in the hold. Yacubian's statement regarding the weight of scallops in the hold was one of

estimation or opinion only and cannot be considered a false statement.

Because the record does not contain substantial evidence to support the ALJ's finding, by a preponderance of the evidence, that Yacubian made false statements to Brown on December 11, 1998, as alleged in Count III, the Agency's finding of liability under Count III will be vacated. It is, therefore, unnecessary for this Court to address plaintiffs' argument that the ALJ erred in holding that a violation of 50 C.F.R. § 600.725(i) does not require proof of the intent to deceive.

### E. Penalty

#### 1. *Factors*

Plaintiffs contend that the penalties imposed by the Agency were arbitrary and capricious. This Court is compelled to set aside such penalties if they are found to be arbitrary, capricious or an abuse of discretion, 5 U.S.C. 706(2)(A), or if they are not supported by substantial evidence, 16 U.S.C. § 1858(b).

In assessing monetary civil penalties, the ALJ is required, by statute and regulation, to take into account a list of enumerated factors, including

> the nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require...[and] may also consider any information provided by the violator relating to the ability of the violator to pay.

16 U.S.C.A. § 1858(a); *see also* 15 C.F.R. § 904.108(a). In determining whether permit revocation is appropriate, the ALJ must consider

> the nature, circumstances, extent and gravity of the prohibited acts for which the sanction is imposed; and...the de-

gree of culpability, any history of prior offenses, and such other matters as justice may require.

16 U.S.C. § 1858(g).

ALJ Bladen recognized the requirements of these provisions and he considered all of the required factors when assessing the penalty. The decision stated that he found that plaintiffs' entries into Closed Area II were intentional, numerous and quite successful, judging by the amount of the catch.

#### 2. *History of Violations*

The ALJ also considered plaintiffs' history of violations. He listed five prior offenses, dating from 1989 to 1998, and stated that in the time he had been an ALJ this was "the most number of prior violations presented to me in any case I have ever heard" and, together with the three counts in the instant case, demonstrated "a history of lack of respect for the law and regulations governing the fishing industry."

Plaintiffs argue that the 1998 violation should not have been considered because it culminated in a settlement agreement in which NOAA explicitly agreed that the violation would not be considered as a prior offense for subsequent violations. This Court agrees. Defendants point to a case stating that settlement agreements with some exculpatory language may qualify as a final order against an employer. *Modern Continental Constr. Co. v. OSHA*, 305 F.3d 43, 52 (1st Cir.2002). The exculpatory language in that case, however, provided that the settlement language may be used for certain, limited purposes. *Id.* The exculpatory language in the settlement agreement at issue in this case sets forth no permissive uses and, accordingly, the 1998 violation should not have been considered as a prior violation.

■ Plaintiffs also contend that the ALJ should not have considered offenses from 1989 and 1991 because they occurred more than five years prior to the offense then under consideration. A May 10, 1995 memorandum from Michele Kuruc, NOAA Assistant General Counsel for Enforcement and Litigation, states that

> for purposes of considering prior violations, it is NOAA's practice to include only those final administrative decisions within the period of time going back 5 years before the date of violation of the subsequent offense.

Plaintiffs attached a copy of that memorandum to their memorandum in support of their motion for summary judgment; it was not, however, contained in the administrative record presented to this Court.

Defendants suggest that the Court should disregard the memorandum as an "extra-record exhibit." This Court rejects defendants' suggestion that an agency can avoid its own policies merely by disregarding them and failing to include them with the record it presents to the reviewing court. It would be nonsensical for a reviewing court to ignore an agency's expressed policy when reviewing a case in which the agency's policy is a relevant issue. The rationale for limiting judicial review to the record is to preclude a reviewing court from considering information that was not before the agency at the time it rendered its decision. If the ALJ was aware of the policy regarding excluding prior offenses that occurred more than five years prior to the offense under consideration (which is presumed), this Court's consideration of the policy does not offend the general rule against considering information not contained in the record. If the ALJ was aware of the policy but disregarded it, his action was arbitrary and capricious.

It is, of course, significant that the subject 1995 memorandum does not purport to contain factual information regarding the offenses at issue. Rather, its relevance is limited to the policies of NOAA that have existed since before the events giving rise to this case occurred. Requiring agency policies to be set forth in the record would be akin to requiring that every statute, regulation and judicial decision on which a party seeks to rely be reproduced in the record. This is clearly not the point of limiting review to the administrative record. Furthermore, defendants acknowledge that the agency has a "five year 'look back' period" and do not dispute the accuracy of the document referred to.

### 3. *Agency Policy*

■ Plaintiffs argue that the ALJ's penalty assessment violated Agency policy in two respects: 1) it was based upon prior offenses that occurred more than five years prior to the offenses then under consideration in violation of Agency policy against considering such offenses, and 2) it disregarded penalty ranges as set forth by NOAA and documented in an exhibit contained in the administrative record. Defendants respond that the ALJ is not bound to follow internal agency guidelines or memoranda.

It is settled law that an agency ordinarily must follow its own policies and procedures and may depart therefrom only with reasoned explanation. *See United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *I.N.S. v. Yang,* 519 U.S. 26, 32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational

departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion'.") (alteration in original); *Ramaprakash v. F.A.A.,* 346 F.3d 1121, 1124 (D.C.Cir.2003) ("agency action is arbitrary and capricious if it departs from agency precedent without explanation"). When the Agency accepted the ALJ's Initial Decision, the decision became a final Agency action and, thus, a decision of the Agency.

*Lovgren v. Byrne,* 787 F.2d 857 (3d Cir. 1986) is the only case cited by the Agency for the proposition that the ALJ need not follow NOAA guidelines and memoranda but the opinion in that case is not on point. There, the Third Circuit Court of Appeals held that the ALJ did not abuse his discretion by imposing a greater penalty than the agency had sought but it did not address whether an ALJ was bound to follow agency policies when imposing penalties. *Id.* at 867.

The ALJ abused his discretion by considering violations by plaintiffs that occurred more than five years before the violations then under consideration without providing any reasoned explanation for departure from Agency policy. If the ALJ disregarded penalty ranges set forth in an internal memorandum promulgated by NOAA, as alleged by plaintiffs, this, too, was an abuse of discretion.[1]

### ORDER

Based upon the foregoing:

1. Plaintiffs' motion for summary judgment (Docket No. 13) is **ALLOWED, in part, and DENIED, in part.** The finding of liability under Counts I and II is sustained and the finding of liability under Count III is vacated. The civil penalties and permit sanctions assessed against plaintiffs are vacated.

2. Defendants' motion for summary judgment (Docket No. 15) is **ALLOWED, in part, and DENIED, in part.**

3. This case is **REMANDED** to NOAA for *de novo* reconsideration of civil penalties and permit sanctions. NOAA is directed to assess an appropriate penalty for plaintiffs based on their violations of Count I and II and, when considering plaintiffs' history of prior offenses, should recognize only two prior offenses, a) the March 19, 1994 landing of Atlantic sea scallops and b) the April 10, 1994 failure to comply with scallop average meat count, or, in the alternative, should explain its departure from the Agency's five year "look back" policy. Moreover, the penalty assessed by NOAA should comport with relevant Agency precedent and guidelines or the Agency should explain its reasons for departure therefrom.

**So ordered.**

---

1. In any event, considering the nature of the offenses and all other relevant circumstances, the severity of the monetary penalty and the *permanent* revocation of plaintiffs' fishing permits are deemed excessive in this particular case.