# United States Court of Appeals
## For the First Circuit

No. 13-1947

LAWRENCE M. YACUBIAN,

Plaintiff, Appellant,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

Jonathan H. Lasken, with whom Paul T. Muniz, Zachary Gates, Burns & Levinson LLP, and Hunton & Williams LLP, were on brief, for appellant.
Christine J. Wichers, Assistant United States Attorney, with whom Anton P. Giedt, Assistant United States Attorney, and Carmen M. Ortiz, United States Attorney, were on brief, for appellee.

April 30, 2014

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LYNCH, Chief Judge**.  Lawrence M. Yacubian, a former scallop fisherman, filed suit in July 2012 alleging his prior prosecution by the National Oceanic and Atmospheric Administration ("NOAA") constituted malicious prosecution and abuse of process under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.  He did so after official reports stated that there had been abuses by NOAA.

The 2012 suit arises out of Yacubian's prosecution in 2000 by the enforcement arm of NOAA.  The Administrative Law Judge ("ALJ") sustained all charges against Yacubian.  On judicial review of the ALJ's decision in 2004, the district court sustained findings of liability on two charges of fishing in a prohibited area, vacated a false statement charge against him, and remanded for adjustment of penalties.  Lobsters, Inc. v. Evans, 346 F. Supp. 2d 340 (D. Mass. 2004).  On remand, Yacubian reached a settlement with the government.

The district court, in this later FTCA case, dismissed both of Yacubian's claims on two independent grounds, see Yacubian v. United States, 952 F. Supp. 2d 334 (D. Mass. 2013), and Yacubian now appeals.

The waiver of immunity under the FTCA for the causes of action Yacubian has chosen to pursue is itself limited in scope. As a matter of federal statute and case law, there can be no FTCA recovery for the actions of the prosecutors who bring such

-2-

enforcement actions but only for the actions of investigative or law enforcement officers who have committed the wrongful acts specified. See 28 U.S.C. § 2680(h); cf. Limone v. United States, 579 F.3d 79, 88 (1st Cir. 2009).

We agree with the district court that Yacubian has failed to state a claim that any law enforcement officer in any way wrongfully induced a malicious prosecution or acted to abuse process. We affirm the district court on those limited grounds. We need not get into thorny limitations period and accrual issues regarding the timing of Yacubian's claims.

I.

On an appeal from a grant of a motion to dismiss, we recite the facts as alleged in Yacubian's complaint, Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 4 (1st Cir. 2011), and as not contradicted by the official documents attached to his complaint, Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 229 n.1 (1st Cir. 2013). Yacubian appended to his complaint other documents, including the Offense Investigation Report from when NOAA officials first boarded his vessel and the 2011 Special Master Report concerning NOAA enforcement actions. He also references the record in the prior proceedings in this case. We consider all of these documents as well. See Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the

pleading 'for all purposes,' including Rule 12(b)(6)." (quoting Fed. R. Civ. P. 10(c))).

A.      Background and Initial NOAA Proceedings

Lawrence M. Yacubian took his fishing vessel F/V Independence on a scalloping trip on December 4, 1998. Coast Guard Officers Timothy Brown and Chris Mooradian, aboard the USCGC Wrangell at the time, observed via radar that the Independence had entered a "Closed Area" where fishing was prohibited. After concluding, based on its "courses and speeds," as tracked on Boatracs, a satellite-based monitoring system, that the Independence appeared to be "engaged in fishing inside the closed area," Officer Brown led a boarding of the vessel.

During the boarding, Officer Brown informed Yacubian that the team was "onboard to ensure that he and the vessel were in compliance with all applicable federal laws and regulations." Brown did not tell Yacubian at the time that the Independence had been plotted inside of the Closed Area.

Officer Brown spoke with Yacubian about his navigational practices and his vessel's equipment, which included a Boatracs unit, as required by applicable fisheries regulations. Lobsters, Inc., 346 F. Supp. 2d at 341-42. Officer Brown asked Yacubian if he had been having trouble with the Boatracs equipment on board, and Yacubian responded that he was not aware of any problems. The two "visually confirmed" that the status of the Boatracs system was

-4-

"good." Officer Brown's report of the boarding noted that Yacubian and his crew were "as cooperative as could be expected" throughout.

Officer Brown also asked Yacubian how many scallops he had on board, both on deck and in the ship's hold. After making clear that he had no way of knowing the exact amount, Yacubian provided an estimate. Officer Brown also made an estimate, and it was higher than Yacubian's. Officer Brown's write-up of the boarding noted the discrepancies between his estimate and Yacubian's but did not indicate that he suspected Yacubian of intentionally making a false statement as to these estimates.

On June 14, 2000, NOAA Enforcement Attorney (EA) Charles Juliand issued Yacubian a Notice of Violation and Assessment (NOVA) and a Notice of Permit Sanctions (NOPS). The NOVA included two counts for fishing in a restricted area (the "prohibited fishing" counts) and one count of making a false statement to an officer about the estimated number of scallops on board. The NOPS, which was issued with the NOVA, revoked Yacubian's vessel and operating permits but did not take effect until all agency action on the matter became final. See 15 C.F.R. § 904.273(c) ("If a party files a timely petition for discretionary [agency] review, . . . the effectiveness of the initial decision is stayed . . . until the initial decision becomes final . . . ."). Yacubian has pled in his complaint that negotiation of a settlement is typical in this type of case, but that in this instance, "EA Juliand was

uncharacteristically unwilling to negotiate a settlement."
Yacubian admittedly had prior violations on his record.

Yacubian had an evidentiary hearing before an ALJ, Edwin
M. Bladen, on the NOVA/NOPS from about June 19 through June 22,
2001. The government was represented by EA Juliand and EA Mitch
MacDonald.

The government introduced data from the Boatracs system
to support the two prohibited fishing charges. Indeed, Yacubian's
case was the first one in which Boatracs data was used as the
entire basis for such a charge. His defense was to challenge the
reliability of the Boatracs system. To this end, Yacubian's
attorney contacted a Massachusetts Environmental Police (MEP)
officer, Lieutenant Peter Hanlon, to obtain evidence as to the
inaccuracy of Boatracs, and then to testify voluntarily on
Yacubian's behalf.

At some point well before the ALJ hearing, Lt. Hanlon was
informed that his superiors were displeased with his decision to
testify for Yacubian's defense. The complaint alleges his
superiors applied pressure to Lt. Hanlon not to testify. This
caused him to ask to be excused from testifying. He did not orally
testify.

Special Agent in Charge at NOAA (SAC) Andy Cohen was one
of several enforcement officers who was "involved in the

investigation and prosecution" of Yacubian.[1]  The complaint alleges

that it was SAC Cohen whose actions caused Lt. Hanlon's superiors

to put pressure on Lt. Hanlon to ask to be excused from testifying.

Specifically, Yacubian alleges, again on information and belief,

that SAC Cohen called Lt. Hanlon's superiors at the MEP to express

displeasure at Lt. Hanlon's initial decision to testify on

Yacubian's behalf.[2]

We describe below the Special Master's report, appended

to the Complaint, as to the incident with SAC Cohen.  According to

that report, Lt. Hanlon did provide a written report to Yacubian's

counsel in support of Yacubian's position, and that report was

---

[1]  In addition to Enforcement Attorneys Juliand and MacDonald, Officers Brown and Mooradian, and Special Agent in Charge Cohen, Yacubian states that Special Agent Louis Jachimcyzk of NOAA Fisheries Office for Law Enforcement was also "involved in the investigation and prosecution."  Special Agent Jachimcyzk is only mentioned again in the complaint to note his comments in a NOAA press release about Yacubian's case: he said that satellite-based Boatracs information "had never been used, on its own, to prove a closed-area case."   Yacubian makes no allegations that SA Jachimcyzk engaged in wrongdoing, or that Mooradian or Brown did.

[2]  Yacubian supports this allegation with a reference to the hearing testimony.  At the June 19 ALJ hearing, Yacubian's counsel stated:
> I was advised by Lieutenant Hanlon that he had been --
> how shall I say this?  I want to be very cautious of the
> way that I say this.  His commander, Captain O'Donnell,
> called him and advised him that she had received phone
> calls from [National Marine Fisheries Service]
> enforcement and that it was pursuant to his employment he
> now -- now a subpoena was necessary.
>   Up until that point, I had no idea -- I was
> understanding that he was going to come voluntarily.  He
> then advised me that he had been called, that he was
> instructed that a subpoena had to issue.

submitted by the defense as part of the official record before the ALJ. Yacubian maintains that he was harmed because the ALJ never heard Lt. Hanlon's oral testimony.

On December 5, 2001, ALJ Bladen issued an Initial Decision that sustained the NOVA/NOPS on both counts and imposed fines and sanctions as proposed by NOAA. The fines totaled $250,000, including a $110,000 civil penalty for each of the two prohibited fishing counts and a $30,000 civil penalty for the false statement charge. Yacubian sought discretionary review within NOAA, which was denied on July 2, 2003. According to Yacubian, this denial constituted a final agency action and triggered the revocation of Yacubian's permits at that time. Lobsters, Inc., 346 F. Supp. 2d at 342-43; see 15 C.F.R. § 904.273(c).

B.      2003 Appeal to the District Court and Post-Remand ALJ Proceeding

On August 1, 2003, Yacubian filed suit in federal district court under the Administrative Procedure Act, 5 U.S.C. § 702, challenging the ALJ's decision on the NOVA/NOPS. He did not ask to stay the revocation of his permit pending judicial review. While that case was pending, Yacubian tried to sell the Independence to finance his ongoing legal expenses; however, the complaint in this case alleges that on three separate occasions, EA

Juliand blocked the sale of the vessel by refusing to agree to allow Yacubian to sell his vessel permit along with the boat.[3]

The parties filed cross-motions for summary judgment in the district court based on the administrative record. On November 29, 2004, the district court (Gorton, J.) (1) sustained the finding of liability as to the two prohibited fishing counts; (2) vacated the finding of liability as to the false statement (about scallops caught) charge,[4] ruling that as a matter of law no false statement could be based on the expression of Yacubian's estimation of how many scallops were on board; (3) vacated the civil penalties and permit sanctions assessed against Yacubian because the penalties were calculated incorrectly and were too high in light of the court's rulings;[5] and (4) remanded the case to NOAA "for de novo

---

[3] EA Juliand later explained to the Special Master investigating this series of events that he blocked the sales attempts because one of the proposed buyers of the vessel was a former employee of Yacubian's, and because EA Juliand feared that Yacubian would simply become a silent partner in the ongoing fishing venture. He also stated that he denied these sales offers because he believed that Yacubian did not have a "rightful claim" to sell the Independence along with its permits. When Yacubian eventually entered a settlement agreement with NOAA, EA Juliand allowed the sale of the boat to a buyer whom he had blocked from purchasing the boat earlier.

[4] The false statement charge was not based on statements about the two prohibited fishing counts.

[5] Adjustments were required because the false statement count was reversed and because the court excluded certain past violations from Yacubian's violation history in light of the agency's five-year look back policy and ruled that the agency abused its discretion in failing to provide any reasoned explanation for its departure from its established policy. Lobsters, Inc., 346 F.

reconsideration of <u>civil penalties and permit sanctions</u>."
<u>Lobsters, Inc.</u>, 346 F. Supp. 2d at 349 (emphasis added). The court further ordered that "NOAA is directed to assess an appropriate penalty . . . based on [the] violations of Count I and II and, when considering [Yacubian's] history of prior offenses, should recognize only two prior offenses . . . or, in the alternative, should explain its departure from the Agency's five year 'look back' policy." <u>Id.</u>

On remand, on or around May 5, 2005, the agency filed a motion for an expedited hearing to reconsider the penalties and permit sanctions.[6] Yacubian opposed the motion, arguing that Judge Gorton's order mandated an entirely new agency proceeding. On June 15, 2005, a new ALJ granted NOAA's motion for an expedited hearing, reasoning that "the original NOVA and NOPS dated June 14, 2000 satisfied the due process requirements embodied in the [Administrative Procedure Act]. On remand, the original NOVA and NOPS still govern unless agency counsel seeks an amendment." The new ALJ made clear that only the penalties as to the prohibited

_____

Supp. 2d at 347-48.

[6] Before the motion for an expedited hearing was filed with the agency, Yacubian filed a Motion for Order in Aid on Enforcement of the Judgment in the district court, and the government opposed it. The focus of these opposing motions was the a dispute over whether the agency was required to reinstate Yacubian's fishing permits while his case was pending before the agency on remand. The underlying liability for the prohibited fishing charges was not contested, nor was the fact that the false statement charge had been vacated entirely.

fishing counts were at issue because the false statement charge had been vacated entirely.[7]

Around June 24, 2005, before any further proceedings, Yacubian signed a settlement agreement with NOAA. Under the agreement, which Yacubian asserts was coercive and excessive, he agreed to (1) pay a $430,000 civil penalty; (2) forfeit $25,972 in profits from fish seized from the Independence in December 1998; and (3) permanently forfeit his commercial fishing permits and privileges. The agreement also made explicit that the transfer to Amber Nicole, Inc. was contingent upon Yacubian signing the settlement agreement. The civil penalties imposed by the settlement were substantially higher than the initial $250,000 fine imposed by the NOVA. Yacubian maintains that EA Juliand's continued efforts to block his sale of the Independence ultimately coerced him into assenting to this settlement.

C.    The 2010 OIG Reports, 2011 Special Master Report, and 2013 Secretary's Memorandum

In 2010, the Office of the Inspector General (OIG) completed an investigation of alleged improprieties in NOAA's fisheries enforcement programs and issued several reports on its findings. The OIG audited NOAA's Asset Forfeiture Fund (AFF), the fund into which Yacubian's fines were paid. The OIG's audit

---

[7] Yacubian pled that the ALJ "reinstated the false statement charge vacated by Judge Gorton." The ALJ's opinion belies this assertion and we do not credit it.

report, released on July 1, 2010, found mismanagement in the expenditure and use of AFF funds.  OIG concluded that the AFF was improperly used to finance the purchase of various luxury vessels and trips around the world that were generally unrelated to NOAA enforcement proceedings.

The OIG final report, issued on September 23, 2010, found that NOAA assessed excessive fines in order to force settlements in several cases.  Yacubian's case and the matter of Lt. Hanlon being pressured not to testify were two of many that were identified for further review by a Special Master.

The Special Master issued his report in April 2011. Yacubian appended a portion of the report to his complaint in this case.  In the report on Lt. Hanlon's case, the Special Master found that SAC Cohen had talked to Lt. Hanlon's superiors, and after the superiors learned Lt. Hanlon had been subpoenaed to testify, they told him that he could not go to court while he was on state duty, nor could he use his cruiser to get there.[8]  The report found that Lt. Hanlon asked Yacubian's counsel to excuse him from appearing in court as a result of pressure from his superiors and others.

Ultimately, the report concluded that Lt. Hanlon "was not prevented from testifying by SAC Cohen," but SAC Cohen's actions

_____

[8]    The report also found that in the months before the ALJ hearing, SAC Cohen asked another Special Agent how to "initiate paperwork" to remove Lt. Hanlon from the agency's list of deputized state officers.

were "sufficient to put enough pressure" on Lt. Hanlon to "request that he be excused from testifying." The report labeled SAC Cohen's conduct as "inappropriate."

As to the prosecution against Yacubian, the Master found that "money was NOAA's motivating objective in this case," and that "EA Juliand had no right to extract an oppressive penalty for the sale of the permits because EA Juliand and others at NOAA completely ignored the plain meaning of Judge Gorton's decision." The Master found that the assessed penalties were excessive, and that NOAA had improperly coerced the settlement. The Special Master recommended that Yacubian be reimbursed $330,000.

On May 17, 2011, Gary Locke, then Secretary of Commerce, issued a "Secretarial Decision Memorandum" which followed up on the Special Master Report. Secretary Locke categorized his view of the various NOAA actions as follows:

> In light of this systemic failing [described in the Master's Report], I find after legal review that none of the conduct described in the report undertaken by any individual NOAA lawyer or law enforcement officer warrants disciplinary action against any employee mentioned in [the Special Master's] report. At bottom, these problems were not the product of individual bad acts, but rather the result of conduct enabled and even encouraged by the management and enforcement culture in place at the time.

As to Yacubian's case specifically, Secretary Locke directed NOAA to remit $400,000 to Yacubian. The affirmance of Yacubian's liability for the two prohibited fishing counts was not mentioned

in the Secretary's Memorandum or in the Master's Report, nor was the permanent forfeiture of Yacubian's operating permits as part of the settlement agreement.

D.        This Case

On January 19, 2012, Yacubian, relying on the Special Master's Report, filed FTCA administrative claims with the Department of Commerce and the Coast Guard.  After the Coast Guard denied his claim,[9] Yacubian filed a complaint in the district court on July 30, 2012.  He alleged that NOAA engaged in abuse of process and malicious prosecution in initiating the 2000 NOVA/NOPS and in negotiating the 2005 settlement agreement.

On October 11, 2012, the United States filed a motion to dismiss the case for lack of subject matter jurisdiction and for failure to state a claim.  On July 8, 2013, the district court (Tauro, J.) granted the motion on two independent grounds.  It held that Yacubian's claims accrued, at the very latest, by June 27, 2005, when he signed the settlement agreement, and that his FTCA claims were time-barred as a result.  Yacubian, 952 F. Supp. 2d at 339-40.  The district court also made an alternative and independent holding, dismissing both the malicious prosecution and abuse of process counts pursuant to Federal Rule of Civil Procedure

---

[9] The Department of Commerce had indicated that it intended to deny his FTCA claim but had not yet officially done so.  Because the six-month period for administrative consideration of the claim lapsed on July 19, 2012, Yacubian's claim was deemed denied under 28 U.S.C. § 2675(a) as of that date.

12(b)(6).  Id. at 340-42.  It relied on the intentional torts exception to the FTCA, under which the United States is immune from prosecution for malicious prosecution and abuse of process claims unless these torts are committed by an "investigative or law enforcement officer."  28 U.S.C. § 2680(h).  The district court found that the NOAA Enforcement Attorneys, who brought and pursued the prosecution and obtained the settlement, were not "investigative or law enforcement officers" within the meaning of the statute, and that Yacubian's complaint failed to state a claim for malicious prosecution or abuse of process as to SAC Cohen, who is a law enforcement officer.  Yacubian, 952 F. Supp. 2d at 341-42.  This appeal followed.  We deal only with the second holding.

## II.

We review a district court's dismissal under Rule 12(b)(6) de novo, construing the facts of the complaint in the light most favorable to the plaintiff.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011).  We indulge in all reasonable inferences in Yacubian's favor.  McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006).  However, "[i]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."  Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 229 n.1 (1st Cir. 2013) (quoting Clorox Co. P.R. v. Proctor & Gamble

Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000)) (internal quotation marks omitted).

To survive a motion to dismiss, Yacubian's complaint "must state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010). This threshold requires that the factual allegations support the "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (internal quotation mark omitted).

The FTCA gives jurisdiction over tort claims only "if a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA is a limited waiver of the federal government's sovereign immunity, McCloskey, 446 F.3d at 266, and, as with all such waivers, it must be "construed strictly in favor of the federal government." Bolduc v. United States, 402 F.3d 50, 56 (1st Cir. 2005) (quoting United States v. Horn, 29 F.3d 754, 762 (1st Cir. 1994)) (internal quotation marks omitted).

The FTCA permits suits against the government for torts "caused by the . . . wrongful act[s] . . . of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). This waiver is limited further for the torts of malicious prosecution and abuse of

-16-

process.  As to these two torts, suits are permitted to proceed only with respect to actions by "investigative or law enforcement officers."  Id. § 2680(h).  It is undisputed here that the actions of federal prosecutors are outside the ambit of § 2680(h) and are accordingly immune from this type of suit under the FTCA.  See, e.g., Limone v. United States, 579 F.3d 79, 88-89 (1st Cir. 2009); Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994) ("[T]he FTCA does not authorize suits for intentional torts based upon the actions of Government prosecutors . . . .").

Yacubian does not dispute the government's assertion that the actions of Enforcement Attorneys Juliand and MacDonald, who brought the charges and were the prosecutors in the ALJ proceedings, are, like those of other federal prosecutors, immune in this context.  That leaves only whether the complaint and appended documents plausibly allege that SAC Cohen himself wrongfully engaged in malicious prosecution or abuse of process. We agree with the district court that they do not.[10]

To discern the elements of a claim under the FTCA, we look to the law of the place where the alleged wrongful act

---

[10]  On appeal, Yacubian does not mount a serious argument that he should be allowed to amend his complaint if we affirm the district court on a Rule 12(b)(6) theory and so we do not consider that option.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

occurred.  See <u>González-Rucci</u> v. <u>U.S. I.N.S.</u>, 539 F.3d 66, 69 (1st Cir. 2008).

A.          <u>Malicious Prosecution</u>

Under Massachusetts law, there are three elements of a malicious prosecution claim.  A plaintiff must establish that he was damaged because (1) the defendant commenced an original action without probable cause, (2) with malice, and (3) that the original action terminated in his favor.  <u>Chervin</u> v. <u>Travelers Ins. Co.</u>, 858 N.E.2d 746, 753 (Mass. 2006).

The two prohibited fishing charges cannot possibly form the basis of Yacubian's malicious prosecution claim because the findings of liability mean that those aspects of the proceedings did not terminate in his favor.  The underlying liability as to those counts was affirmed.  <u>Lobsters, Inc.</u>, 346 F. Supp. 2d at 349.

This leaves only a claim for malicious prosecution based on the initiation of the false statement charge.[11]  We address whether the allegations against SAC Cohen plausibly state a claim as to that matter.

As to the first element, there is no allegation at all that SAC Cohen in any way initiated the prosecution of any charge,

---

[11]  We do not need to reach the argument by the United States that there was no termination of any part of the enforcement proceedings which was in Yacubian's favor.  The government says the claims were settled, and that the Secretarial Decision Memorandum did not terminate or invalidate the 2000 NOVA/NOPS or vacate the operative terms of the Settlement Agreement, including the relinquishment of permits and forfeiture of profits.

much less the false statement charge.  The only specific allegation of SAC Cohen's involvement related to activities after the charges were brought.[12]  In particular, the only wrongdoing alleged is SAC Cohen inducing Lt. Hanlon's superiors into pressuring Lt. Hanlon not to testify as to the prohibited fishing charges.[13]  But Lt. Hanlon had no knowledge relevant to the false statement charge and was not a witness as to that charge.  As the district court noted, the Complaint does not allege "that any of the investigative or law enforcement officers named in the Complaint induced or caused EA Juliand to issue the 2000 NOVA/NOPS. Nor does plaintiff allege that any of the officers exercised control or influence over EA Juliand's decisions in prosecuting the case."  Yacubian, 952 F.

---

[12] Yacubian's "continuation of a prosecution" theory fails for a number of reasons, including that there plainly was at least probable cause for the prohibited fishing charges and because merely taking steps to strengthen a case does not make agents "continuers" of a prosecution.  Limone, 579 F.3d at 91.

[13] Even accepting the proposition that SAC Cohen acted improperly in this regard, that does not aid Yacubian's case. Limone, 579 F.3d at 90 (even where record leaves no doubt federal agents acted deplorably, that does not mean they can be said to have instituted wrongful prosecution).

To the extent Yacubian suggests an inference can be drawn that this action after the charges were brought suggests that SAC Cohen somehow maliciously induced the initial prosecution or service of the complaint, the inference is neither reasonable nor plausible. See Bernard, 25 F.3d at 104 (holding that actions by agent after prosecution is brought cannot support claim of malicious prosecution in bringing the charges).

To the extent Yacubian suggests SAC Cohen applied pressure by protesting Lt. Hanlon's testimony absent a subpoena, such a protest would be unremarkable.  There is nothing inherently illegitimate or malicious in the federal government's request for a subpoena to minimize the likelihood of giving a false impression.

Supp. 2d at 342 (footnote omitted).  Without such allegations, the complaint cannot state a claim for malicious prosecution.

The complaint must permit the "reasonable inference" that SAC Cohen in some sense caused the bringing of the NOAA false statement charges, and it requires "more than a sheer possibility" that he acted unlawfully.  Iqbal, 556 U.S. at 678.  The bare allegation that SAC Cohen was "involved" in the investigation of Yacubian's case simply does not permit any plausible inference that he, and not the Enforcement Attorneys, was responsible in any way for the institution or maintenance of the prosecution.[14]  See Limone, 579 F.3d at 89.  He was obviously not present at the time the false statements were made.  Indeed there is no assertion that SAC Cohen had any knowledge pertinent to the false statement charge.  That dooms Yacubian's malicious prosecution claim.

---

[14]  The Special Master's report on two other matters, unrelated to Yacubian's case, noted that SAC Cohen was involved in and caused process (in those cases, an Administrative Inspection Warrant) to issue.  The Master made no express conclusions as to SAC Cohen's actions in those other cases.  Yacubian urges us to infer from these other two cases that SAC Cohen "supplied and further influenced the prosecution with respect to all of the charges" in this case.  That is not a plausible inference.  The special Master made no such findings as to SAC Cohen in Yacubian's case.  First, the Special Master did not make any conclusions that SAC Cohen acted improperly in those other two cases.  Second, there are no allegations in the complaint to support the link Yacubian suggests, and SAC Cohen's actions in two unrelated cases are not germane to the events here.

B.          Abuse of Process

Under Massachusetts law, an abuse of process claim requires a plaintiff to show that "process" was used for an ulterior or illegitimate purpose and resulted in damages. Vittands v. Sudduth, 730 N.E.2d 325, 332 (Mass. App. Ct. 2000). We begin and end here with the first requirement: the use of "process." That term "means causing papers to be issued by a court to bring a party or property within its jurisdiction." Id. at 332 n.9 (quoting Silvia v. Bldg. Inspector of W. Bridgewater, 621 N.E.2d 686, 687 n.4 (Mass. App. Ct. 1993)) (internal quotation mark omitted). One can "use process" under Massachusetts law by providing information that causes process to be used improperly. See Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 563-64 (Mass. 2002) (holding that where plaintiffs presented evidence that officers falsified arrest reports which provided the basis for criminal complaints, a jury could conclude those officers "caused papers to issue" by a court). The parties agree that the only "process" at issue in this case is the original NOVA/NOPS.

As we have said, Yacubian does not plausibly allege that SAC Cohen had any involvement in EA Juliand's initial decision to file the NOVA/NOPS and serve it on Yacubian. Under Iqbal, that is insufficient.

Yacubian, on appeal, urges us to infer from his complaint that SAC Cohen "used process" in "supplying the basis for the

Enforcement Attorneys to secure the NOVA/NOPS with an ulterior purpose."  His complaint does not so plead, and we have no need to discuss this further.

III.

The judgment of the district court is <u>affirmed</u>.