# United States Court of Appeals

## For the First Circuit

No. 01-2635

MODERN CONTINENTAL CONSTRUCTION COMPANY, INC.,

Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION
AND ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR,

Respondents.

ON PETITION FOR REVIEW OF AN ORDER OF THE

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

Before

Torruella and Lipez, Circuit Judges,

and Schwarzer,[*] Senior District Judge.

Richard D. Wayne, with whom Debra Dyleski-Najjar and Hinckley, Allen & Snyder LLP was on brief, for petitioner.
John Shortall, Attorney, with whom Eugene Scalia, Solicitor of Labor, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, and Ann S. Rosenthal, Counsel for Appellate Litigation, was on brief, for respondents.

September 30, 2002

---

[*]  Of the Northern District of California, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  This is a case arising under the Occupational Safety and Health Act of 1970 ("OSH Act" or the "Act"), 29 U.S.C. §§ 651-678.  Petitioner Modern Continental Construction, Inc. ("MCC") seeks review of a final decision by the Occupational Safety and Health Review Commission (the "Commission"), which affirmed the citations issued against MCC under the OSH Act by the Secretary of Labor.  Finding that the citations are supported by substantial evidence in the administrative record, we deny MCC's petition for review and affirm the Commission's order.

## I.

MCC is a general contractor at a work site associated with the "Big Dig," a massive construction project that will submerge a section of interstate highway below the streets of Boston.  The events in question took place in an underground room -- approximately forty feet long, twenty to thirty feet wide, and twenty feet deep -- built to provide ventilation to highway tunnels.  On Saturday, July 22, 2000, MCC employees, under the direction of general foreman Pasquale Pezzano ("Pezzano"), engaged in the dangerous, but not uncommon, task of hoisting shoring materials from this underground room.  The hoisting required employees in the underground room to manually secure, or "rig," loads of shoring materials to a crane for withdrawal through a small rectangular opening at the surface.

Generally, loads are rigged in a horizontal fashion.  This manner promotes balance and increases safety.  However, on

-2-

this particular day, at least one load could not be rigged horizontally because its width exceeded that of the opening at the surface. Instead, this load was rigged vertically, a dangerous and awkward method.

In addition to the difficulty inherent in hoisting an unstable vertical load, the access hole itself presented a problem. According to Pezzano and Anthony Cappuccio ("Cappuccio"), another MCC foreman working that day, the surface hole was the smallest from which they had ever removed shoring. Despite the fact that hoisting a load vertically through a small opening requires a great degree of skill and presents an increased element of danger, MCC provided no formal training to its employees on securing a load for vertical hoisting. Nor was training provided for alternative rigging methods, such as rigging the load diagonally or removing each piece of shoring by hand.

The vertical load in question was initially rigged by MCC employee Natalio Elías ("Elías"), an inexperienced worker with limited English proficiency. On his first attempt, Elías used only a single strap to secure a load of about twenty cross-braces. Though it was inadequately secured, Foreman Cappuccio was given the signal to raise the one-hundred-pound bundle. From the surface, Cappuccio noticed that the strap was slipping as the load was being raised, so he signaled for it to be lowered. Cappuccio explained to Elías that he either needed to double-wrap the cross-braces or use an additional strap. No other instructions concerning the securing of the load were given. When Elías did not appear to

understand Cappuccio's explanation, another employee, fluent in Elías' native Portugese, was summoned to translate.

After these efforts failed, Louis Sousa, another MCC foreman, eventually rigged the vertical bundle himself and signaled for Cappuccio to begin lifting. As the heavy load was being raised, its weight shifted, and the entire load slipped and fell back down through the access hole. One of the cross-braces struck Elías, impaling him through the head.

On July 24, 2000, two days after the accident, Compliance Officer Eric Jones, of the Occupational Safety and Health Administration ("OSHA"), began a post-accident investigation. Following the inspection, OSHA issued MCC the following citations:

> 1. Serious Citation 1, Item 1, alleging a violation of 29 C.F.R. § 1926.21(b)(2) because "employees were not adequately trained in rigging methods."
>
> 2. Repeat Citation 2, Item 1, alleging a violation of 29 C.F.R. § 1926.550(a)(19) for failing to assure that all employees were kept clear of suspended loads.

The Administrative Law Judge ("ALJ") affirmed both citations.[1] Sec'y of Labor v. Modern Cont'l Constr. Co., 19 OSHC (BNA) 1760 (OSHA ALJ Div. 2001). MCC then challenged the ALJ's decision by filing a Petition for Discretionary Review with the Commission. When no Commission Member directed the matter for

---

[1] Serious Citation 1, Item 2 was withdrawn by the Secretary at the hearing. That citation alleged a violation of 29 C.F.R. § 1926.251(a)(1) ("Rigging equipment for material handling shall be inspected prior to use on each shift and as necessary during its use to ensure that it is safe. Defective rigging equipment shall be removed from service.").

review, the ALJ's decision automatically became a final order of the Commission by operation of law. See 29 U.S.C. § 661(j). MCC then filed a timely petition with this Court to review the Commission's final order.

## II.

Our review of the Commission's order is deferential. Final orders of the Commission are subject to the general judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706. See P. Gioioso & Sons, Inc. v. OSHRC, 115 F.3d 100, 107-08 (1st Cir. 1997). Under those provisions, we will uphold agency determinations unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this determination, we defer to the agency's reasonable interpretation of the OSH Act and the governing regulations. See Beaver Plant Operations, Inc. v. Herman, 223 F.3d 25, 29 (1st Cir. 2000). The OSH Act also directs that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 29 U.S.C. § 660(a); see also P. Gioioso & Sons, 115 F.3d at 108. This deferential standard governs even where, as here, the Commission does not hear the case itself but instead adopts an ALJ's findings. Modern Cont'l/Obayashi v. OSHRC, 196 F.3d 274, 280 (1st Cir. 1999).

MCC disputes the Commission's adverse determination on both of the citations against it, arguing that neither is supported by substantial evidence or relevant law. MCC also challenges the

propriety of the penalty assessed against it.  We address each argument in turn.

### A.  Citation 1 - Failure to Train

Congress enacted the OSH Act to reduce employment-related injury and illness.  See 29 U.S.C. § 651.  To that end, the Act places primary responsibility on employers -- that is, those who oversee and control the work environment -- to achieve compliance with its standards and ensure a safe workplace.  See S. Rep. No. 91-1282, at 9 (1970), reprinted in 1970 U.S.C.C.A.N. 5177, 5186 ("Employers have primary control of the work environment and should insure that it is safe and healthful.").  Thus, under the Act, an employer must "comply with occupational safety and health standards promulgated under this chapter," 29 U.S.C. § 654(a)(2), and, if no applicable standards exist, "furnish to each of his employees . . . a place of employment which [is] free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees."  Id. § 654(a)(1).

For further guidance, Congress provided OSHA with authority to promulgate occupational safety and health standards by regulation.  Id. § 655.  Pursuant to this authority, the agency has issued two types of standards.  The first, known as the "general industry standards," see 29 C.F.R. pt. 1910, act as a default set of standards.  In addition, OSHA has presented various sets of standards applicable only to certain industries.  The agency has promulgated a set of such industry-specific standards for the

implementation of the OSH Act in the construction industry.[2]  See 29 C.F.R. pt. 1926.  These regulations are applicable to any place of employment where construction work is performed.  See 29 C.F.R. § 1910.12(a).

The construction-industry standard applicable to MCC's first citation provides: "The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury."  29 C.F.R. § 1926.21(b)(2).  The citation against MCC specifically charged that "employees were not adequately trained in rigging methods."  "In order to establish a violation of an [OSH Act] standard, the Secretary must show: (a) the applicability of the cited standard; (b) the employer's noncompliance with the standard; (c) employee access to the violative condition; and (d) the employer's actual or constructive knowledge of the violation."  Modern Cont'l/Obayashi, 196 F.3d at 279.  MCC challenges the Commission's order with respect to the failure-to-train citation on both legal and factual grounds.

MCC argues first that, as a matter of law, the citation is defective because there is no "rigging" standard established by OSHA and that improper rigging is not one of the "hazards" contemplated by § 1926.21(b)(2).  According to MCC, the true hazard

---

[2]  The construction-industry standards were adopted shortly after the passage of the OSH Act, and are comprised of federal standards that had previously been promulgated under the Construction Safety Act of 1969, 40 U.S.C. § 333.  See Reich v. Simpson, Gumpertz & Heger, Inc., 3 F.3d 1, 4 (1st Cir. 1993).

in this case is the danger of a falling load, a hazard that is already covered by a separate regulation and that cannot be completely eliminated by training in alternate rigging methods.

MCC interprets the protections of the Act far too narrowly. The training regulation in question provides in general terms that employers must instruct each employee in the "recognition and avoidance of unsafe conditions." 29 C.F.R. § 1926.21(b)(2). The purview of the regulation is not limited to training for hazards expressly identified by OSHA regulation. The Commission has stated that "[u]nder § 1926.21(b)(2), an employer must instruct its employees in the recognition and avoidance of those hazards of which a reasonably prudent employer would have been aware." Capform, Inc., 19 OSHC (BNA) 1374, 1376 (OSHRC 2001), aff'd, 34 Fed. Appx. 152 (5th Cir. 2002). Similarly, the regulation does not require only such training as will completely eliminate hazards; it also requires training in the "avoidance" and "control" of dangerous conditions. 29 C.F.R. § 1926.21(b)(2). Therefore, as a legal matter, it is of no moment that OSHA has not prescribed a specific "rigging" standard. Rather, the question is whether a reasonably prudent employer would have been aware of the hazard arising from the failure to train in proper rigging methods. Notably, MCC does not claim that a reasonable employer would not have been aware of the dangers inherent in failing to train employees in the safe rigging of loads. Nor does MCC claim that such training departs from standards in the industry. Thus, we

conclude that the failure-to-train citation stands on a solid legal foundation.

MCC also challenges the factual basis for the ALJ's decision, arguing that the record clearly demonstrates that MCC gave adequate training in proper rigging methods. According to MCC, training in safe rigging was taught on an on-the-job basis by other laborers and journeymen.

In concluding that MCC did not satisfy the training requirements under § 1926.21(b)(2), the ALJ weighed the evidence presented by MCC against the evidence presented by the Secretary. Interestingly, both sides arrived at the same conclusion: MCC employees received little or no training on how to rig loads that could not be rigged horizontally. For instance, the testimony of three high-ranking MCC employees, Foremen Cappuccio and Pezzano and Wayne Rice ("Rice"), MCC's vice-president of corporate safety, admitted that hoisting a load vertically was not recommended because it was less stable and more difficult than lifting a load horizontally. Yet, none of these witnesses could identify any form of employee training in alternate methods. In addition, the ALJ heard testimony from a former MCC employee, Scott Collins, who did not recall ever receiving any training in rigging for small access holes, loose bundles, or vertical loads.

The foregoing demonstrates that the ALJ's decision was amply supported by substantial evidence in the record. And since MCC has not provided any compelling evidence to the contrary, we affirm the ALJ's conclusion as to the failure-to-train citation.

## B.  Citation 2 - Repeat Violation

MCC was also charged with a repeat violation of 29 C.F.R. § 1926.550(a)(19), which provides that "[a]ll employees shall be kept clear of loads about to be lifted and of suspended loads." Id.  Although it is apparent that the standard was violated -- the accident itself shows that Elías was not clear of the suspended load -- MCC argues it should not be held accountable because the violation resulted from idiosyncratic employee conduct that it could not, and was not required by law to, control.  MCC argues further that the ALJ erred in concluding that MCC's failure to abide by § 1926.550(a)(19) constitutes a "repeat" violation, which is subject to additional penalties under the OSH Act.  See 29 U.S.C. § 666(a).

We first address MCC's argument that it established a complete defense to the violation.  As this Court has explained before:

> The OSH Act requires that an employer do everything reasonably within its power to ensure that its personnel do not violate safety standards.  But if an employer lives up to that billing and an employee nonetheless fails to use proper equipment or otherwise ignores firmly established safety measures, it seems unfair to hold the employer liable.

P. Gioioso & Sons, 115 F.3d at 109.  We have therefore recognized an affirmative defense of unpreventable employee misconduct.  In order to reach the safe harbor of this defense, an employer must demonstrate: (1) that it established a work rule to prevent the reckless behavior or unsafe condition from occurring; (2) that it

adequately communicated the rule to its employees; (3) that it took steps to discover incidents of noncompliance; and (4) that it effectively enforced the rule whenever employees transgressed it. Id. at 109. Our review of the ALJ's analysis of these factors comports with the usual deferential standards.

As to the first element of the defense, MCC contends that it had an established work rule, often repeated to employees, to "stay clear of the load" and "stay away from the hole." The ALJ concluded that these general admonitions were insufficient as a work rule to prevent violations of the standard. The ALJ pointed out that this general rule gave no indication of when employees were required to stay clear of the hole, a necessary consideration, given the fact that the employees in the enclosed area were expected to continue working near the hole at times when no load was being hoisted. The ALJ also credited evidence from the Secretary indicating that the employees working below the loads had an obstructed view of the access hole and thus had no knowledge of when a load was being hoisted.[3] Given the total lack of specificity in MCC's rule and the obvious insufficiency of its command, we have no problem affirming the ALJ's conclusion that the admonition to "stay away from the hole" was not an adequate work rule. See PBR, Inc. v. Sec'y of Labor, 643 F.2d 890, 895 (1st Cir.

---

[3] MCC presented photographs, taken ten months after the accident, as evidence that employees in the access hole could clearly see when a load was overhead. The ALJ concluded that the Secretary's conflicting photographs, taken shortly after the accident, were more reliable. Given the great deference we owe to the ALJ on such matters, we see no reason to disturb the fact-finder's evaluation of the photographs.

-11-

1981) ("[The employer] cannot escape responsibility for the violation because it warned its employees to exercise caution. Such delegation of employee safety to the employees themselves is clearly inconsistent with the purposes and policies of the Act.").

The ALJ also found that MCC failed to establish the second prong of the affirmative defense -- namely, that the work rule was adequately communicated to employees. In particular, the ALJ found that the training provided was not tailored to the needs of those employees with little experience or with limited understanding of English, such as Elías, the employee injured in the accident. The ALJ observed that MCC's training materials were provided only in English, despite a large number of employees with limited English proficiency.

Furthermore, the ALJ found that MCC did not establish that it took steps to discover violations of the rule or that it took any disciplinary action when such violations were discovered. Testimony from Rice, Cappuccio, and Pezzano supported this finding. Rice admitted that MCC did not note violations in personnel files and that the company's foremen, who have direct supervision over laborers, were reluctant to issue warnings. In addition, Cappuccio and Pezzano testified that they could not recall any employee who had been "written up," suspended, or otherwise disciplined for violating the work rule to stay clear of a load. MCC thus failed to satisfy the third and fourth prongs of their proposed defense.

Based on this evidence, the ALJ found that MCC had not met its burden in proving unpreventable employee misconduct.

Again, we decline to upset a ruling so firmly rooted in the administrative record.

As a backup argument, MCC claims that, even if it violated the standard, the ALJ erred in concluding that the violation was a "repeat" violation for purposes of the additional penalty provisions of the OSH Act, 29 U.S.C. § 666(a). "A violation is 'repeated' if the employer 'violated the same standard on an earlier occasion in a substantially similar fashion.'" Modern Cont'l/Obayashi, 196 F. 3d at 283 (citing P. Gioioso & Sons, 115 F.3d at 103 n.2.). The Secretary establishes substantial similarity "by showing that the prior and present violations are for failure to comply with the same standard, at which point the burden shifts to the employer to rebut that showing." Sec'y of Labor v. Monitor Constr. Co., 16 OSHC (BNA) 1589, 1594 (OSHRC 1994).

MCC raises two arguments to the imposition of this assessment. First, MCC argues that there is no prior violation because the earlier citation resulted only in a settlement agreement that contained exculpatory language. Second, MCC argues that, even assuming the informal agreement was evidence of a prior violation, the facts and circumstances of the prior violation were substantially different from the current violation. Though we address each argument, we find that neither has merit.

In February 2000, MCC was cited for violation of § 1926.550(a)(19). The citation was resolved by means of an informal settlement agreement. MCC argues that this settlement

-13-

cannot form the antecedent for a consequent finding of a "repeat" violation under 29 U.S.C. § 666(a). As MCC notes, courts have generally held that repeated violations require a previous final order against the employer for a substantially similar violation of the same standard. See, e.g., Reich v. D.M. Sabia Co., 90 F.3d 854, 860 (3d Cir. 1996).

However, settlement agreements, even those with some exculpatory language, have often been found to qualify as a final order against an employer. See Sec'y of Labor v. Ford Dev. Corp., 15 OSHC (BNA) 2003 (OSHRC 1992) (holding that a settlement agreement has the force and effect of an adjudication and can serve as the basis for finding a later violation "repeated" within the meaning of the OSH Act); Sec'y of Labor v. DIC-Underhill, 9 OSHC (BNA) 2223 (OSHRC 1980) (same); Sec'y of Labor v. Dun-Par Engineered Form Co., 8 OSHC (BNA) 1044 (OSHRC 1980) (same). Moreover, the language contained in the settlement agreement at issue here does not exempt MCC from the possibility of a repeat violation. Indeed, the agreement provides that the "agreements, statement, stipulations, findings and actions taken herein . . . shall not be used for any purpose, except for proceedings and matters arising under the OSHA Act [sic] (29 U.S.C. 651 et seq.)" (emphasis added). We therefore find no error in the ALJ's conclusion that this settlement agreement could be used to prove a repeat violation.

MCC also argues that the facts and circumstances of the prior violation were substantially different from the present one.

-14-

MCC bore the burden of making this showing, and the ALJ concluded that it failed to do so. MCC's previous violation of 29 C.F.R. § 1926.550(a)(19)occurred when it allowed employees to work in a confined underground space below a suspended man-basket. The current violation concerns employees working in a confined underground space below suspended shoring materials. The ALJ found that in both instances, the employees were exposed to the same hazard: working below suspended materials in an enclosed area. Based on the record and evidence before us, we conclude that the ALJ had substantial evidence to support such a finding. We therefore affirm the classification of this violation as repeated.

### C. Penalty assessment

Finally, MCC challenges the ALJ's penalty assessment, arguing that it was entitled to a reduction based on its safety record and good faith attempts to enforce a safety program. The OSH Act gives the Commission "the authority to assess all civil penalties." 29 U.S.C. §666(j). In the exercise of this authority, the Commission must "giv[e] due consideration to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations." Id. We review the Commission's penalty assessment only for a manifest abuse of discretion. See Union Tank Car Co. v. OSHRC, 192 F.3d 701, 707 (7th Cir. 1999); Bush & Burchett, Inc. v. Reich, 117 F.3d 932, 939 (6th Cir. 1997).

-15-

The ALJ was authorized to assess a penalty up to $70,000 for the repeat violation and up to $7,000 for the training violation. See 29 U.S.C. § 666(a) & (b). The penalties imposed, totaling $42,000, were well within the bounds of the Act. It was also within the ALJ's discretion to refuse to give reductions for good faith or prior history based on what he found the evidence in this case established. The four factors set out in 29 U.S.C. § 666 (j) need not be given equal weight. The gravity of a particular violation may warrant the assessment of a weighty penalty, "even though the employer may rate perfect marks on the other three criteria." Bush & Burchett, 117 F.3d at 940 (citing Sec'y of Labor v. Nacirema Operating Co., 1 OSHC (BNA) 1001, 1003 (OSHRC 1972)). We therefore see no need to disturb the ALJ's decision with respect to the appropriate penalty.

## III.

For the reasons stated above, we **affirm** the order of the Commission and **deny** MCC's petition for review.