# United States Court of Appeals
## For the First Circuit

No. 16-2268

THOMAS G. GALLAGHER, INC.,

Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION; R. ALEXANDER
ACOSTA, Secretary of Labor, U.S. Department of Labor,[*]

Respondents.

PETITION FOR REVIEW OF A FINAL ORDER OF
THE OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

Before

Torruella, Kayatta, and Barron,
Circuit Judges.

James F. Laboe, with whom Orr & Reno, P.A. was on brief, for
petitioner.
Scott Glabman, Senior Appellate Attorney, U.S. Department of
Labor, with whom Nick Geale, Acting Solicitor, Ann Rosenthal,
Associate Solicitor for Occupational Safety and Health, and
Heather R. Phillips, Counsel for Appellate Litigation, were on
brief, for respondents.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), former Secretary of
Labor Thomas E. Perez was substituted for Acting Secretary of Labor
Edward Hugler, who has been substituted for Secretary of Labor
R. Alexander Acosta.

December 4, 2017

**BARRON**, **Circuit Judge**.  This petition for review challenges a final order of the Occupational Safety and Health Review Commission ("Commission") that affirmed a fine levied against a Massachusetts-based employer -- Thomas G. Gallagher, Inc. ("Gallagher") -- that had been imposed by the Occupational Safety and Health Administration ("OSHA"), for two violations of OSHA workplace health and safety standards.  Gallagher contends that the Commission's order cannot be sustained.  We disagree and deny the petition for review.

## I.

We begin by reviewing the relevant statutory and regulatory landscape.  We then lay out the undisputed facts that are relevant to the petition for review.

## A.

Congress enacted the Occupational Safety and Health Act ("OSH Act") to reduce employment-related injury and illness.  See 29 U.S.C. § 651; Modern Cont'l Constr. Co. v. Occupational Safety & Health Review Comm'n, 305 F.3d 43, 49 (1st Cir. 2002).  To accomplish that end, the OSH Act authorizes the Secretary of Labor ("Secretary") to promulgate rules setting forth workplace health and safety standards.  See 29 U.S.C. §§ 651(b)(3), 661, 665; Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 147 (1991) (citing Cuyahoga Valley Ry. Co. v. United Transp. Union,

474 U.S. 3, 6-7 (1985) (per curiam)). The Secretary has in turn delegated the exercise of that rulemaking authority to OSHA.[1]

OSHA promulgates rules setting forth health and safety standards pursuant to 29 U.S.C. § 654(a)(2). Some standards, like those at issue here, are known as "general standards" or "general industry standards," because they apply to a variety of different types of industries. Others standards are known as "industry-specific standards" because they apply only to specific industries, such as, for example, the maritime or construction industry. See Modern Cont'l Constr. Co., 305 F.3d at 49; Reich v. Simpson, Gumpertz & Heger, Inc., 3 F.3d 1, 4 (1st Cir. 1993).

OSHA health and safety standards, "require[] conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). In the event that "[OSHA] determines upon investigation that an employer is failing to comply with . . . a [promulgated] standard, [OSHA] is authorized to issue a citation

---

[1] OSHA is an agency within the Department of Labor. Day v. Staples, Inc., 555 F.3d 42, 52 n.4 (1st Cir. 2009). The Secretary has delegated authority under the OSH Act to the Assistant Secretary for Occupational Safety and Health, who heads OSHA. Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 77 Fed. Reg. 3912, 3912-13 (Jan. 25, 2012); see Martin, 499 U.S. at 147 n.1.

[pursuant to an OSHA general or industry-specific standard] and to assess the employer a monetary penalty." Martin, 499 U.S. at 147 (citing 29 U.S.C. §§ 658-659, 666).

Employers may be cited for violations -- in consequence of the existence of a dangerous condition prohibited by a general workplace safety standard -- that range from ones that are "serious," 29 U.S.C. § 666(k), to ones that are "not serious," id. at § 666(c), to ones that are merely "de minimus," 29 C.F.R. § 1903.14. A "serious" violation, which is the type of violation for which Gallagher was cited, is:

> [D]eemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

29 U.S.C. § 666(k) (emphasis added); see Brock v. Morello Bros. Constr., 809 F.2d 161, 164 (1st Cir. 1987).

A "serious" violation, therefore, only arises if an employer has knowledge of the presence of the condition prohibited by the workplace safety standard, though, as 29 U.S.C. § 666(k) makes clear, an employer need not have actual knowledge of that condition's presence in order for the employer to be liable for a serious violation. See W.G. Yates & Sons Constr. Co. v. Occupational Safety & Health Review Comm'n, 459 F.3d 604, 607 (5th

- 5 -

Cir. 2006).  The employer may, instead, be found liable for having only constructive knowledge of that condition's existence in the workplace, in the sense that the employer may be deemed to know of that condition if "with the exercise of reasonable diligence, [the employer] could have known of the presence of the violative condition."  Pride Oil Well Serv., 1991-93 CCH OSHD ¶ 29,807, p. 40,583 (No. 87-692, 1992).  And, we have held that, with respect to violations of health and safety standards under the OSH Act, the knowledge of a supervisor may be imputed to an employer such that "an employer can be charged with constructive knowledge of a safety violation that supervisory employees know or should reasonably know about."  P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 675 F.3d 66, 73 (1st Cir. 2012).

The OSH Act also establishes the Commission, which consists of three members, each of whom is appointed by the President with the advice and consent of the Senate.  Martin, 499 U.S. at 147.  The Commission is charged under the OSH Act with acting "as a neutral arbiter," In re Perry, 882 F.2d 534, 537 (1st Cir. 1989) (quoting Cuyahoga Valley Ry. Co., 474 U.S. at 7), in carrying out adjudicative functions under that statute.[2]  Martin, 499 U.S. at 147-48 (citing 29 U.S.C. § 651(b)(3)).

---

[2] The Commission is an independent federal agency that is separate and distinct from both OSHA and the Department of Labor. See In re Perry, 859 F.2d 1043, 1045 n.2 (1st Cir. 1988).

The Act provides that, "[i]f an employer wishes to contest a [violation] citation, the Commission must afford the employer an evidentiary hearing and 'thereafter issue an order, based on findings of fact, affirming, modifying, or vacating [OSHA's] citation or proposed penalty.'" Id. (quoting 29 U.S.C. § 659(c)). The initial decision regarding a challenge to a citation issued by OSHA is made by an administrative law judge ("ALJ"). 29 U.S.C. § 661(j); Martin, 499 U.S. at 147-48. The initial decision rendered by the ALJ "become[s] the final order of the Commission . . . unless . . . any Commission member has directed that such report shall be reviewed by the Commission." 29 U.S.C. § 661(j). Thereafter, "[b]oth the employer and the Secretary have the right to seek review of an adverse Commission order in the court of appeals." Martin, 499 U.S. at 148.

**B.**

In the case at hand, Jason Thibault ("Thibault"), a member of Pipefitters Local 537 labor union in Massachusetts for twelve years,[3] was working on August 1, 2014 as a pipefitter for Gallagher, which operates a business in Massachusetts that makes prefabricated piping systems for installation in major construction projects. The accident that resulted in OSHA issuing

---

[3] Upon completing five years of formal training from the union as an apprentice, Thibault achieved "journeyman" status.

- 7 -

the citation to Gallagher for the two workplace safety violations at issue here occurred in Gallagher's fabrication shop after Thibault, using two web slings,[4] rigged a pipe assembly that weighed roughly 5,000 pounds to an overhead bridge crane and then used the crane to hoist the assembly.

During the hoist, Thibault placed his right hand on the pipe assembly, which was teetering, to steady it. Thereafter, a weld suddenly broke and part of the pipe assembly then smashed Thibault's hand, resulting in serious injuries, including the loss of his index and middle fingers above the knuckles.

The pipe assembly, it turns out, had been rigged improperly in two respects. First, the pipe assembly was rigged with the slings near the midpoint of the assembly rather than on the assembly's two ends. Second, one of the slings was rigged around multiple pipes. This improper sling configuration resulted in the load teetering when hoisted and caused lateral force to be exerted on the outermost pipes of the assembly. Consequently, due to the resulting pressure, a weld broke during the lift.

The only person other than Thibault who witnessed the accident was another Gallagher employee -- Joseph Myles ("Myles"). Myles was present at the scene of the accident because he was

---

[4] A "sling" is "an assembly which connects the load to the material handling equipment." 29 C.F.R. § 1910.184(b). The slings at issue were made from synthetic web -- i.e., nylon, polyester or polypropylene. See id. at § 1901.184(a).

assisting Thibault with the pipe assembly lift, including by operating the hoist. The fabrication shop pipefitter foreman -- Mark DiCristoforo ("DiCristoforo") -- was Thibault's immediate supervisor. But, DiCristoforo was in his office at the time of the accident and did not see the accident occur.

In consequence of the accident and on the same day that the accident occurred, an OSHA compliance officer arrived at the fabrication shop to conduct an onsite inspection and to investigate the circumstances of the accident. During the inspection, DiCristoforo attempted to weigh the pipe assembly for the OSHA officer. In doing so, DiCristoforo rigged the pipe assembly to a scale in a manner that was substantially similar to the improper rigging used by Thibault.

As a result of his inspection, the OSHA officer found "serious" violations of several OSHA workplace safety standards. The OSHA officer then issued Gallagher a two-item citation, which described Gallagher's violation of two OSHA general industry standards.

Gallagher was first cited for a serious violation of 29 C.F.R. § 1910.179(n)(3)(i), which requires a "load shall be well secured and properly balanced in the sling or lifting device before it is lifted more than a few inches." As a basis for this violation, the citation stated that the "pipe assembly hoisted [by Thibault and Myles] . . . was not well secured, nor properly

balanced while [employees] attempt[ed] to place it onto support stands greater than a few inches high."[5]

Gallagher was also cited for a serious violation of 29 C.F.R. § 1910.184(c)(9), which requires that "[w]henever any sling is used, the following practices shall be observed: . . . . All employees shall be kept clear of loads about to be lifted and of suspended loads." The reason given in the citation for this second violation was that Gallagher "[e]mployee(s) were on the load or hook while hoisting, lowering or traveling [of the load] was preformed," as evidenced by the fact that the "assembly of pipes was hoisted . . . with employees' hands on it."[6]

Based on these two serious violations, OSHA fined Gallagher a total of $11,250 -- $7,000 for the first violation and $4,250 for the second. Gallagher timely contested the citation and proposed penalty. The Commission subsequently docketed the matter and assigned it to an ALJ for a hearing and decision.

---

[5] OSHA did not cite Gallagher for any alleged violations as a consequence of DiCristoforo's improper rigging of the pipe assembly when trying to weigh it for the OSHA officer.

[6] The second citation was originally issued for a "serious" violation of 29 C.F.R. § 1910.179(n)(3)(v), which requires that "[w]hile any employee is on the load or hook, there shall be no hoisting, lowering, or traveling [of the load or hook]," but was later amended by OSHA to a "serious" violation of 29 C.F.R. § 1910.184(c)(9), as "§ 1910.184(c)(9) more accurately reflect[ed] the standard violated than [29 C.F.R. § 1910.179(n)(3)(v)]."

An evidentiary hearing before an ALJ was held, where, by a preponderance of the evidence, it was the Secretary's burden to establish the following for each of the two workplace safety standard violations: (1) that the cited standard applies; (2) that there was a failure to comply with the standard by virtue of the existence of a workplace condition prohibited by the standard; (3) that employees had access to the prohibited condition; and (4) that the employer had actual or constructive knowledge of the violation of the safety standard.  See P. Gioioso & Sons, Inc., 675 F.3d at 72; see also Pride Oil Well Serv., 1991-93 CCH OSHD at p. 40,583  (describing the fourth prong as whether the "employer knew, or with reasonable diligence, could have known of the presence of the violative condition").  For each of the serious violations, the parties stipulated to the ALJ that the cited OSHA general industry standards applied and Gallagher, in its post-hearing briefing, contested only whether Gallagher had knowledge of each of the two violations.  Gallagher did also assert, however, the affirmative defense of unpreventable employee misconduct ("UEM").[7]

---

[7] To prove a UEM defense, by a preponderance of the evidence Gallagher had to show that it: "(1) established a work rule to prevent the reckless behavior and/or unsafe condition from occurring, (2) adequately communicated the rule to its employees, (3) took steps to discover incidents of noncompliance, and (4) effectively enforced the rule whenever employees transgressed it."  See P. Gioioso & Sons, Inc., 675 F.3d at 71.

The ALJ found with respect to each serious violation that Gallagher had the requisite knowledge of the existence of a condition prohibited by the applicable workplace safety standard, because, although Gallagher lacked actual knowledge of the condition's presence in the workplace at the time of the accident, Gallagher had constructive knowledge. The ALJ also found that Gallagher had not proved its UEM affirmative defense with respect to either violation. Therefore, the ALJ affirmed the citation with respect to both serious violations.

The ALJ did, however, reduce the penalties proposed by the OSHA officer in the citation. Specifically, the ALJ imposed a reduced penalty of $1,050 for the first serious violation and of $2,450 for the second serious violation.

Gallagher then filed a petition for discretionary review ("PDR") with the Commission. The Commission, however, declined to direct that petition for review. The ALJ's decision thus became the final order of the Commission.

Gallagher now petitions for review of the Commission's final order. In doing so, Gallagher challenges only the ALJ's determination that Gallagher had constructive knowledge with respect to each of the serious violations for which OSHA cited Gallagher.

## II.

Because the Commission adopted the ALJ's decision as its final order, we focus on the ALJ's opinion. See, e.g., P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 115 F.3d 100, 108 (1st Cir. 1997) (reviewing the ALJ's findings of fact and conclusions where the Commission adopts the ALJ's findings of fact and conclusions as its final order). In undertaking that review, we are mindful that we "will uphold agency determinations unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" P. Gioioso & Sons, Inc., 675 F.3d at 72 (quoting 5 U.S.C. § 706(2)(A)). In that regard, we must "defer to the agency's reasonable interpretation of the [OSH] Act and its governing regulations." Id.; Modern Cont'l Constr. Co., 305 F.3d at 48.

In addition, the OSH Act directs that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 29 U.S.C. § 660(a); see also Martin, 499 U.S. at 147-48 ("[T]he court of appeals[] . . . must treat as 'conclusive' Commission findings of fact that are 'supported by substantial evidence.'"); Harry C. Crooker & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 537 F.3d 79, 82 (1st Cir. 2008) (similar). As a result, "[u]nder this deferential standard, we must 'accept reasonable factual inferences drawn by the Commission[,]'" P.

Gioioso & Sons, Inc, 675 F.3d at 72 (quoting Donovan v. Daniel Constr. Co., 692 F.2d 818, 820 (1st Cir. 1982)), and "give great deference to credibility determinations by the ALJ," id. Moreover, "[t]his deferential standard governs even where, as here, the Commission does not hear the case itself but instead adopts an ALJ's findings." Id. (citing Modern Cont'l/Obayashi v. Occupational Safety & Health Review Comm'n, 196 F.3d 274, 280 (1st Cir. 1999)); see also Modern Cont'l Constr. Co., 305 F.3d at 48-49.

## A.

We turn first to Gallagher's challenge to the portion of the ALJ's decision that affirms the serious violation imposed under 29 C.F.R. § 1910.179(n)(3)(i), which is a general industry standard that establishes what constitutes a safe condition for the handling of the pipe assembly at issue. That standard provides that: "The load shall be well secured and properly balanced in the sling or lifting device before it is lifted more than a few inches." Id.

Gallagher does not dispute that Thibault and Myles rigged and hoisted the pipe assembly at issue in violation of this safety standard. Gallagher merely contests its knowledge of that violation. So the key issue is whether Gallagher provides a persuasive basis for challenging the ALJ's finding that Gallagher had constructive knowledge -- namely, that Gallagher could have

- 14 -

known through the exercise of reasonable diligence, see Pride Oil Well Serv., 1991-93 CCH OSHD at p. 40,584 -- that employees would rig and hoist the pipe assembly more than a few inches, while the pipe assembly was neither well secured, nor properly balanced.

The ALJ based the conclusion that Gallagher did have constructive knowledge of this occurrence on a theory of imputed knowledge, in consequence of what the fabrication shop foreman, DiCristoforo, "knew." Specifically, the ALJ determined that DiCristoforo "certainly anticipated the hazard posed by even an experienced pipefitter undertaking alone and unsupervised the 'dangerous job' of rigging the 'big and heavy' pipe assemblies [such as the pipe assembly at issue]," yet DiCristoforo "failed in his supervision of even the experienced journeyman pipefitters on the rigging of those pipe assemblies, by failing to adequately communicate instructions that the pipe assemblies be rigged only at his express[] direction and only under his direct supervision." In addition, the ALJ found that though DiCristoforo testified that he would gather "the right guys" to rig and load large pipe assemblies like the one involved in the accident, that "team" "had not been formed to rig and move the pipe assembly, and there [wa]s no evidence that [DiCristoforo] had communicated to any workers that he intended to form such a team that day."

Gallagher does not dispute that DiCristoforo's constructive knowledge can be imputed to Gallagher. Gallagher's

challenge is thus only to the ALJ's conclusion that DiCristoforo, and therefore Gallagher, had constructive knowledge of Thibault and Myles lifting, more than a few inches, a load that was not well secured or properly balanced.

Gallagher first challenges the ALJ's "constructive knowledge analysis" on the ground that it "had nothing to do with the violative condition at issue" because "[t]raining in proper rigging techniques would address securing and balancing suspended loads." But, the ALJ supportably found that DiCristoforo's testimony established that DiCristoforo anticipated that the prohibited condition could occur even if one of the fabrication shop pipefitters was trained in the relevant manner, so long as the trained pipefitter undertook the rigging of the large pipe assemblies alone and unsupervised. And Gallagher offers no reason for concluding that this finding, if supported by substantial evidence, cannot as a legal matter supply the basis for concluding that DiCristoforo was therefore obliged to exercise reasonable diligence to address that danger by taking steps to ensure that such riggings would not occur without his direct supervision and not to rely simply on the training that his personnel had received to ensure that riggings would not be done in such a way as to cause a violation of the safety standard when a load was lifted. See Pride Oil Well Serv., 1991-93 CCH OSHD at p. 40,584 (finding employer "had constructive knowledge because its supervisor could

have . . . eliminated the hazard with the exercise of reasonable diligence").  Thus, Gallagher's first challenge fails because the finding is not, as a legal matter, unrelated to the violative condition in the way that Gallagher contends.

Gallagher, alternatively, though relatedly, argues that the ALJ's conclusion that Gallagher failed to exercise reasonable diligence is wrong as a matter of law given that it was "impossible" for the ALJ to find that Gallagher had constructive knowledge of the violative condition given that certain findings made by the ALJ necessarily "preclude any fault being attributed to Gallagher."  But, this argument, too, fails.

The Commission has ruled that the "reasonable diligence" inquiry takes account of a number of factors, including "the employer's obligation to have adequate work rules and training programs, to adequately supervise employees, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence of violations."  Precision Concrete Constr., 2001 CCH OSHD ¶32,331, p. 49,552 (No. 99-707, 2001) (citing Pride Oil Well Serv., 1991-93 CCH OSHD at p. 40,583); see also Mountain States Contractors, LLC v. Perez, 825 F.3d 274, 285 (6th Cir. 2016) ("When considering the question of reasonable diligence, the ALJ looks to a number of factors including: 'an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence.'"

- 17 -

(quoting Kokosing Constr. Co. v. Occupational Safety & Hazard [sic] Review Comm'n, 232 Fed. Appx. 510, 512 (6th Cir. 2007))); N & N Contractors, Inc. v. Occupational Safety & Health Review Comm'n, 255 F.3d 122, 127 (4th Cir. 2001) ("Factors relevant in the reasonable diligence inquiry include the duty to inspect the work area and anticipate hazards, the duty to adequately supervise employees, and the duty to implement a proper training program and work rules."). And Gallagher does not ask us to apply a different test to assess DiCristoforo's reasonable diligence. In consequence, it is hard to see how the findings that Gallagher identifies as precluding the ALJ's ruling suffice to undermine that ruling, given the other findings that the ALJ also made but that Gallagher essentially ignores.

To be sure, the ALJ did find that, at the evidentiary hearing, the Secretary presented no evidence to controvert the compliance officer's initial conclusion "that the employees in the fabrication shop had received sufficient training in rigging and that [Thibault] had received proper training [from his union] on how to rig the pipe assembly" that injured him. And, it is also true that the ALJ found that the Secretary had "not demonstrated that Gallagher failed to exercise reasonable diligence by not having a work rule that explicitly prescribed or proscribed the precise manners by which to rig the type of pipe assembly that was involved in the accident." As Gallagher also notes, the ALJ did

find as well that Gallagher "maintained and executed an adequate inspection program in the fabrication shop[.]"

But Gallagher is mistaken in contending that -- in light of "the short duration of the violative condition, and [DiCristoforo's] near constant presence on the fabrication shop floor," as well as the lack of "any 'evidence that . . . Gallagher ha[d] a history of employees engaging in unsafe conduct when it comes to rigging" -- these findings "conclusively demonstrate" that "as a matter of law," Gallagher "cannot be charged with constructive knowledge." The reason is that Gallagher neither disputes the ALJ's other findings, nor explains why the ALJ could not have relied on them in combination with the record as a whole, which supports the Secretary's assertion that Gallagher failed to exercise reasonable diligence notwithstanding the training the employees had received and the other steps that the ALJ found that Gallagher took to keep the worksite safe.

After all, in addition to the findings that Gallagher highlights, the ALJ also found that DiCristoforo recognized the dangerousness in rigging the particular type of pipe assembly at issue.[8] And the ALJ further found that DiCristoforo had identified

_____

[8] In its reply brief, for the first time, Gallagher argues the ALJ "mischaracterized . . . DiCristoforo's testimony in contending that multiple pipefitters were required merely to rig large assemblies" and contends DiCristoforo testimony only shows that "a team of pipefitters was used because the size and weight

- 19 -

a method of mitigating that danger by ensuring that, even though his personnel had been trained in the rigging of pipe assemblies, he would be present at the rigging only with a select "team," and that he would then supervise that team. Moreover, the ALJ found as well that, notwithstanding DiCristoforo's concern about permitting even trained personnel to perform the rigging absent his supervision of the select team, he had failed to adequately communicate the requirement that he be present for such riggings to employees at the shop, Thibault included.

---

of such large assemblies made them more dangerous to move and load onto trucks for transport." But, as this argument is raised for the first time in Gallagher's reply brief, it is waived. See United States v. Eirby, 515 F.3d 31, 37 n.4 (1st Cir. 2008). And, in any event, Gallagher's argument is inconsistent with Gallagher's characterization of the same testimony in its post-hearing briefing to the ALJ:

> When it came to rigging and loading pipe assemblies, Mr. DiCristoforo was the person in charge. He oversaw the rigging and loading of pipe assemblies because: 1) it is dangerous and 2) it requires the proper selection of employees. In the years leading up to the accident, T.G. Gallagher employees never rigged and loaded pipe assemblies like the one involved in the accident without Mr. DiCristoforo's direction. In the six months leading up to the accident, pipework assemblies (like the one involved in the accident) were always rigged under the direct supervision of Mark DiCristoforo.

Furthermore, viewing the entire record, there is substantial evidence for the factual finding or inference that DiCristoforo thought that rigging pipe assemblies like the one involved in Thibault's accident was a "dangerous job," and that DiCristoforo's prescribed procedure was not solely concerned with the mere loading of the pipe assemblies onto trucks for transport.

In this regard, the ALJ found that there was "no evidence [the prescribed] procedure was set forth in any written form," and that "it is likely that [DiCristoforo] communicated it to the workers orally, if at all." And, the ALJ then went on to find, "whether this protocol was communicated in writing or orally or both, the weight of the evidence establishe[d] that it was communicated inadequately."[9]

Finally, the ALJ found that it was more likely than not that the employees, including Thibault, would have understood and complied with that protocol had it been communicated to them. Thus, the ALJ found that DiCristoforo's inadequate communication gave rise to the violation, given DiCristoforo's failure to take a step to address the hazardous condition that, in the exercise of reasonable diligence, could have been taken: namely, properly

_____

[9] Significantly, the record also includes evidence that, in addition to the accident instance, Thibault had twice before rigged the same pipe assembly, by himself and without DiCristoforo's knowledge, the same improper way he rigged it the day of the accident. The record evidence showing these others instances of Thibault rigging the pipe assembly in a manner that was inconsistent with the prescribed procedure supports the ALJ's finding of inadequate communication of the prescribed procedure "regarding rigging large and heavy pipe assemblies" to "[Thibault] as well as to other workers in the fabrication shop." And further supporting that finding is Thibault's testimony that Myles did not apprise him of the procedure. Specifically, Thibault testified that Myles, who was assisting in the hoist of the improperly rigged pipe assembly, did not caution Thibault that their actions "contravened [DiCristoforo's] prescribed procedure."

communicating the need for workers to assemble and work as a team under the foreman's direction before performing such rigging.

As Gallagher does not challenge any of these findings,[10] Gallagher's challenge to the ALJ's reasonable diligence -- and thus constructive knowledge -- analysis cannot succeed. In so concluding, we are mindful that the reasonable diligence inquiry takes account not just of an employer's obligations regarding the training that employees receive and the issuance of work rules. That inquiry also considers factors such as an employer's obligation to adequately supervise employees, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence of violations. See Precision Concrete Constr., 2001 CCH OSHD at p. 49,552. And yet, even though the reasonable diligence inquiry allows for consideration of all of these factors, Gallagher simply fails to explain why it was

_____

[10] In a footnote in its opening brief, Gallagher does question "one of the . . . bases" the ALJ relied upon in finding that DiCristoforo's communication of the prescribed procedure was deficient -- namely that the ALJ's conclusion regarding the relevance of Myles's failure to caution Thibault that their activities contravened DiCristoforo's procedure only makes sense if Myles was a pipefitter, which he apparently was not. But, this argument is not dispositive of any larger issue, as Gallagher itself concedes its argument only addresses "one" of the multiple bases relied upon by the ALJ with respect to its conclusion. And, in any event, no matter what Myles's job at the shop was, he was operating the crane hoisting the large pipe assembly during the accident and Gallagher does not explain why Myles's knowledge, or lack thereof, of the prescribed procedure would not be probative of whether instructions were adequately provided to other shop employees who also operated the crane to hoist pipe assemblies.

- 22 -

"arbitrary, capricious or otherwise an abuse of discretion" for the ALJ to weigh the factual findings supporting a conclusion that Gallagher exercised reasonable diligence with the factual findings suggesting the conclusion that Gallagher did not exercise reasonable diligence, and for the ALJ to find that, in the balance, Gallagher failed to exercise reasonable diligence. We thus deny the petition for review with respect to the order regarding the first item of the citation.

**B.**

We turn next to the second serious violation, which concerns a violation of 29 C.F.R. § 1910.184(c)(9). That provision requires that "[w]henever any sling is used, . . . [a]ll employees shall be kept clear of loads about to be lifted and of suspended loads." Id. The ALJ found, and Gallagher does not contest, that while the pipe assembly was suspended as Thibault (with the assistance of Myles) attempted to move the assembly, Thibault "put his right 'hand on the pipe.'" The ALJ then concluded that "Gallagher's failure to have, and thus enforce, a work rule that prohibited a worker from placing hands directly on a suspended load in the fabrication shop constitute[d] a lack of reasonable diligence," sufficient to "charge[] [Gallagher] with having constructive knowledge of the violative condition." Thus, once

again, the key issue concerns whether Gallagher had constructive knowledge of the existence of this prohibited condition.

Gallagher argues that the ALJ erred in concluding that Gallagher "should have known in the exercise of reasonable diligence . . . that [Thibault] would . . . place a hand directly on a suspended load," given that the ALJ found "Thibault was fully and adequately trained on how to rig large loads like the [pipe a]ssembly [at issue] -- and that training included not placing his hands on the load while suspended."  But, contrary to Gallagher's assertion, the ALJ did not find that Thibault's "training included not placing his hands on the load while suspended."  The ALJ found instead that the training that Thibault did receive actually "endorsed the practice of employees placing hands directly on suspended loads under certain circumstances."

Regarding Thibault's training, though the ALJ found "no evidence regarding the precise content of the rigging training that [Thibault] received at the union," the ALJ did find that "the pipefitter trade is generally regarded to be a construction industry trade" and "that workers in the construction industry may under some circumstances place hands directly on a suspended load."  In particular, the ALJ pointed out that with respect to an OSHA construction-industry specific standard relating to cranes and hoisted loads, "[u]nlike the cited general industry standard relating to slings [29 C.F.R. § 1910.184(c)(9)], the construction

industry [OSHA] standard for cranes . . . seemingly allows employees to place hands directly on suspended loads."

But, as described by the ALJ, and not contested by Gallagher in its petition for review, OSHA standards specific to the construction industry are not applicable to the operation of the fabrication shop's crane because the shop is not a place of employment engaged in construction work. Instead, the parties agree that the general industry standards, including 29 C.F.R. § 1910.184(c)(9), are applicable. And given Gallagher's agreement that the general industry standards are applicable, Gallagher does not explain why it would have been reasonable for it to rely on training that record evidence suggests allowed for practices that were incompatible with the general industry standard at issue, which Gallagher does not dispute did not allow employees to place their hands on a suspended load. Thus, given that the ALJ also found that Gallagher's own safety manual endorsed a reliance on the inappropriate construction industry standard, rather than 29 C.F.R. § 1910.184(c)(9) (the general industry standard), we see no basis for disturbing the ALJ's finding that "Gallagher could not reasonably regard [Thibault]'s union training and years of work experience as having informed him not to place hands directly on a load that was suspended by the fabrication shop's . . . crane."

Gallagher also argues that the ALJ's conclusion that Gallagher had constructive knowledge of the prohibited condition

was, in part, based on the erroneous conclusion that "Gallagher had no specific written or unwritten work rule that prohibited a worker [in the fabrication shop] from putting a hand directly on a suspended load[.]"  Gallagher contends that it did have a work rule in its safety manual stating that employees "should never stand or work under a suspended load," and, for that reason, Gallagher contends that Thibault was "only able to put his hands on the pipe assembly because he was violating this rule."

But the Secretary argues, and we agree, that Gallagher "fail[ed] to urge these objections before the Commission." Specifically, Gallagher failed to refer this "under a suspended load" work rule "to the Commission's attention . . . by its inclusion in a PDR," and the record is devoid of any indication that the issue was otherwise raised sua sponte by a commissioner. See P. Gioioso & Sons, Inc., 115 F.3d at 105-06 ("Only if an issue is actually called to the attention of the Commission, through the PDR or by a Commission member's spontaneous initiative, will the Commission have the informed opportunity that Congress intended -- a meaningful chance to correct a mistake before an order becomes final.").  Thus, this work rule-based argument is waived.  See id.

Moreover, it is not at all clear that Gallagher's work-rule based challenge could succeed.  The ALJ never stated that an employee must necessarily be under a suspended load in order to

- 26 -

lay hands on that load. And rightly so, as an employee who is positioned adjacent to or even above a pipe assembly -- rather than underneath the assembly -- could presumably lay their hands on it. Thus, it is hardly clear that the work rule to which Gallagher now points undermines the ALJ's finding that "Gallagher had no specific written or unwritten work rule that prohibited a worker from putting a hand directly on a suspended load[.]"

Gallagher's remaining arguments concerning Gallagher's serious violation of 29 C.F.R. § 1910.184(c)(9) were also not raised in its PDR and thus would appear to be waived, though the Secretary does not so argue. In any event, they lack merit.

Gallagher contends that the fleeting nature of Thibault's action and Thibault's lack of a history of breaking work rules shows that there was "no indication that any such infraction would occur" and that, when it did occur, it happened too quickly for Gallagher to discover the violation of § 1910.184(c)(9).[11] But, the required condition was that "[w]henever any sling is used, . . . [a]ll employees shall be kept clear of loads about to be lifted and of suspended loads." 29 C.F.R. § 1910.184(c)(9). In light of the fact that, as found

_____

[11] To the extent Gallagher is arguing that these facts support a finding that the conduct at issue was unpreventable employee misconduct, the ALJ considered and rejected Gallagher's UEM affirmative defense, and Gallagher has not sought review of that determination.

by the ALJ, no one ever instructed Thibault not to place his hands on a suspended load, coupled with other facts found by the ALJ that have already been described -- that Gallagher had no work rule prohibiting employees from laying hands on suspended loads and that Gallagher relied on employees' union training and a safety manual that did not prohibit such conduct -- we can hardly say Thibault's clean disciplinary record[12] rendered the ALJ's findings regarding Gallagher's ability to anticipate and prevent the hazard through reasonable diligence unsupported by substantial evidence. And, because Gallagher is charged with only constructive knowledge, it is of no consequence that neither DiCristoforo nor any other supervisory official in the company did not actually see Thibault place his hand on the pipe. Thus, Gallagher's challenge on this score fails as well.

### III.

For these reasons, Gallagher's petition for review is **denied**.

---

[12] With regard to Gallagher's urgings regarding Thibault's "clean disciplinary record," notably record evidence also "indicated that it was not unusual for [Thibault to place hands directly on a suspended load]," because, as Thibault testified, "usually you need to control [the load] so it doesn't swing around or take off."